**William S. HENSLEY, Administrator of the Estate of Smith Ball, Appellant,**

**v.**

**Mattie BALL et al., etc., Appellees.**

Court of Appeals of Kentucky.

June 26, 1964.

Wix Unthank, Harlan, for William S. Hensley, Adm'r of Smith Ball Estate.

Ray O. Shehan, Harlan, Edward Dooley, Middlesboro, for Charlie, Dizney, and Carter Ball, Ethel Ball Gilbert, and J. R. Weiler, Adm'r of Robert Ball Estate.

William A. Rice, Harlan, for Mattie Ball.

Joe A. Wallace, Louisville, for Creed Ball, Woodrow Ball, Beatrice Ball Ashurst, and Beatrice Ball Ashurst, Admr'x of Willard Ball Estate.

PALMORE, Judge.

Smith Ball died intestate at his home in Harlan County on June 2, 1954, at the age of 77. He was survived by his wife, Mattie, and two sets of children by previous marriages. He had amassed a substantial amount of property during his lifetime, and his death was followed by controversy among the survivors. This is a suit by the administrator against the widow and children to recover assets and settle the estate. Each and all of the parties have appealed from various aspects of a partial judgment (made final and appealable as authorized by CR 54.02) determining ownership of the personal property.

One set of the children consisted of Charlie Ball, Dizney Ball, Robert Ball, Carter Ball and Ethel Ball Gilbert. Robert died during the proceeding, and his interest is now represented by an administrator.

The other set of children consisted of Creed Ball, Willard Ball, Woodrow Ball, and Beatrice Ball Ashurst. Willard died during the proceeding and his interest is now represented by an administratrix.

Except that he operated a second hand store and apparently engaged in the business of lending money, the record does not reveal the origins of Smith Ball's fortune. However, during the later years of his life a goodly part of his income was derived from numerous securities in which he had invested. Over a long period of time he bought and sold many of these securities in the names of the various children but collected the dividends and interest himself and from time to time gave money to the children to cover taxes they were required to pay on this income.[1] Most of the bonds and stock certificates falling in this category were kept in a safe which belonged to Smith Ball but was located in the home of his son Charlie, and to which Charlie had access. Both Charlie and Dizney worked for their father most of their lives, and their homes were situated close to his home. Dizney handled most of his stock investments and transactions, whereas Charlie kept the safe and, at his father's direction, endorsed the names of his brothers and sisters (excepting Dizney) on dividend checks payable to them and paid the money over to his father. This was done without the specific consent of the other members of the family, but for the most part[2] they were aware that stocks were being bought, sold and exchanged in their names and that Smith Ball was receiving the income.

Several stocks acquired by Smith Ball in the name of his wife, Mattie, were kept by her in a cedar chest at home. Just who endorsed the dividend checks (if any) on this stock is not clear, but presumably the money went to Smith Ball. Though Mattie regarded the stock as belonging to her husband during his lifetime, after his death she sold it and retained the proceeds, amounting to $5,299.53. Her position now, however, is that all of the securities acquired by Smith Ball really belonged to him, and not to the persons

1. Some years before his death the federal government collected a large sum (perhaps $50,000) from him pursuant to a deficiency income tax assessment.

2. Beatrice says she knew her father had bought stocks in her name but did not know he sold any of them.

in whose names he caused them to be issued.[3]

For the purposes of this discussion the property in dispute can be classified as follows:

1. Corporate stock certificates in the possession of the person named thereon as owner and on which the named owner was receiving and retaining dividends prior to Smith Ball's death. This included $155,000 worth of stock in Dizney's, $28,000 in Charlie's, and $20,000 in Robert's possession, and they were adjudged the owners.

2. Corporate stock certificates in Mattie's name kept in the cedar chest at the home of Smith and Mattie Ball, as heretofore mentioned. The Smith Ball estate was adjudged the owner and thus entitled to recover $5,299.53 from Mattie.

3. Corporate stock certificates in the names of the respective children, kept in the safe at Charlie's house and delivered or caused to be delivered by Charlie to the named owners after their father's death. Dividend checks thereon had been endorsed by Charlie at his father's direction, as heretofore mentioned. The Smith Ball estate was adjudged the owner and entitled to recover $11,500 from Charlie, $179 from Ethel, $2,500 from Robert, $265 from Willard, $16,000 from Woodrow, and an unascertained amount from Carter.

4. Kentucky Finance Company debenture bonds, each in the names of Smith Ball or one of the children. Some were in the safe at Charlie's house and the rest had been left at the office of the finance company in Lexington. All were delivered to the respective co-owners after the death of their father. The Smith Ball estate was adjudged the owner and entitled to recover $5,000 from Charlie, $4,000 from Dizney, $5,000 from Robert, $6,500 from Willard, $6,500 from Woodrow, $4,800 from Creed, $5,500 from Beatrice and $500 from Carter.

5. U.S. "E" Bonds, each in the names of Smith Ball or one of the children, kept in the safe at Charlie's house and delivered or caused to be delivered by Charlie to the respective co-owners after their father's death. The Smith Ball estate was adjudged the owner and entitled to recover $900 from Ethel, $1,840 from Robert, $1,650 from Willard, $2,200 from Woodrow, $1,650 from Creed, $830 from Beatrice, and $750 from Carter.

6. Finance company stock certificates, each in the names of Smith Ball or one of the sons, kept in the safe at Charlie's house and delivered to the respective co-owners after the father's death. The Smith Ball estate was adjudged the owner and entitled to recover $4,000 from Charlie and $2,500 from Dizney.

7. Certificate for 1,000 shares of Kentucky Finance Company common and certificate for 1,000 shares of New Finance Company preferred, each in the names of Smith, Charlie or Dizney Ball, kept in the safe at Charlie's house and delivered by Charlie to Dizney after their father's death. The Smith Ball estate was adjudged the owner and entitled to recover $11,500 from Dizney.

8. Certificate for 500 shares of New Finance Company common, in the name of Smith Ball as trustee for Dizney Ball, kept in the safe at Charlie's house and delivered by Charlie to Dizney after his father's death. The Smith Ball estate was adjudged the owner and entitled to recover $1,500 from Dizney.

9. Three promissory notes payable to Charlie Ball, evidencing money loaned by Smith Ball. Payments on principal and interest during Smith Ball's lifetime were collected by Charlie and turned over to his father.[4] These notes had been kept

---

3. It is hard to resist the inference that this magnanimity stems from the fact that her share in the estate will be greatly enhanced by recovery of the value of the securities received by the various children.

4. Charlie handled the collections on all of Smith Ball's loans.

at the store and were taken by Charlie after his father's death. The Smith Ball estate was adjudged the owner and entitled to recover $1,050 from Charlie.

10. A $90,554.17 account in First Federal Savings and Loan Association of Winter Haven, Florida, and a $7,300.50 account in First Federal Savings and Loan Association of Lakeland, Florida, opened in November of 1953 in the names of Smith Ball *or* Charlie Ball. The funds deposited to these accounts were taken to Florida from Harlan by Smith Ball, who took Charlie with him to the two institutions and had him sign the required signature cards. After his father's death Charlie removed $57,000 (or, as he contends, $47,000) of this money. The balance was seized by the Internal Revenue Service, which charged onto the scene like a mad rhinoceros after Smith Ball's death and eventually exacted from Charlie, Dizney and the estate a settlement of its large and numerous tax claims. The Smith Ball estate was adjudged the owner of these two accounts and entitled to recover $57,000 from Charlie.

11. In Smith Ball's pocketbook at the time of his death were two cashier's checks in the respective amounts of $20,459.81 and $25,348.98 from the Harlan National Bank, dated May 18, 1954, two weeks prior to his death. Each was made payable to Smith Ball *and* Charlie Ball. They were turned over to the administrator. The evident source of these checks was the recent sale of some 24 stocks which had been issued in the individual names of Creed, Willard and Beatrice. On May 13, 1954, at their father's direction, Charlie and Dizney took the certificates to a stock brokerage in Knoxville, Tennessee, and the endorsements of Creed, Willard and Beatrice, without their knowledge or consent, were forged. Checks thereafter issued by the brokerage house payable to Creed ($29,432.05), Willard ($22,959.81) and Beatrice ($23,466.73) were mailed to Smith Ball, and the names of the payees

were endorsed thereon either by Charlie or his father (neither Charlie nor Dizney remembers the details of this transaction very well). Smith Ball received the proceeds.

Charlie contends he was half owner of the two cashier's checks. They were adjudged, however, to be wholly owned by the Smith Ball estate.

12. Three cashier's checks, $3,000 to Creed, $2,000 to Willard and $2,000 to Beatrice, purchased by Smith Ball and given to Charlie shortly after the Knoxville transaction for delivery to the respective payees, the purpose of which was to cover income taxes they would be required to pay. They were not delivered by Charlie until around Christmas of 1954, several months after Smith Ball's death. The Smith Ball estate was adjudged the owner of these checks and entitled to recover $3,000 from Creed, $2,000 from Willard, and $2,000 from Beatrice.

13. Mattie Ball kept $30 or $40 cash found on Smith Ball's person after his death and sold an automobile worth about $600. Apparently the title to this car was in her name, else she would not have been able to transfer it. The estate's claim against Mattie for $640 was not allowed (or mentioned) in the judgment.

In stating his conclusions of law the chancellor relied largely on the requirements for an inter vivos gift as stated in Bryant's Adm'r v. Bryant, Ky., 269 S.W.2d 219 (1954). It was his opinion that except for the stocks in possession of Charlie, Dizney and Robert Ball before their father's death, on which they had collected the dividends, these requirements had not been met. However, in the recent case of Marcum v. Marcum, Ky., 377 S.W.2d 62 (1964), the "gift" theory with respect to intangibles was carefully reconsidered and found to be inapplicable when a transfer is effected through redesignation of the ownership interest on the face of the contractual instrument, as distinguished

from a mere manual delivery of the paper. Although that case involved U. S. savings bonds, which are governed by federal laws on the subject, the decision would nevertheless have been the same otherwise, and its rationale is equally applicable to other bonds and stock certificates. It should not be any different with respect to a cashier's check, a bank account, or any other evidence of indebtedness.

Stock certificates, notes, bonds, and cashier's checks are basically alike in that each is evidence of contract rights held by the owner or payee against the signatory institution or party. When one person causes such a document to be issued by a second person in favor of another, individually or jointly, the latter becomes a third party beneficiary of the transaction, and is vested with the rights evidenced by the instrument, which is no less a contract simply because it may generally and more familiarly be regarded as a title document.[5]

Applying this conception to the case before us, we find the judgment erroneous in its determination that the various stocks, bonds, notes and cashier's checks classified above under the numbers 2, 3, 4, 5, 6, 7, 9, 11 and 12 belonged to the estate of Smith Ball, and correct in its determination of the ownership of the stocks classified as No. 1.

The stock certificate issued in the name of Smith Ball as trustee for Dizney Ball (No. 8) was the substantial equivalent of a certificate issued directly to Dizney, as the relationship was a dry trust. Cf. Osgood's Ex'x, v. Gleason, 229 Ky. 116, 16 S.W.2d 782 (1929) ; 54 Am.Jur. 29 (Trusts, § 12). "A dry or simple trust * * * is a simple separation of the legal and equitable estates, *which can be united at the option of the cestui que trust.*" (Emphasis added.) Carpenter

v. Carpenter's Trustee, 119 Ky. 582, 84 S.W. 737, 68 L.R.A. 637, 115 Am.St.Rep. 275 (1905). Hence it was error to adjudge Smith Ball's estate the owner.

The two cashier's checks described in classification No. 11 belonged equally to Charlie and the estate of Smith Ball, subject to such determination as the trial court shall make with respect to the contentions of Creed, Willard and Beatrice that they were purchased with money received through the unauthorized sale of stocks belonging to them and the unauthorized endorsement of checks issued in payment therefor.

With regard to No. 13, if the title instrument covering ownership of the car Mattie sold was in her name after the death of her husband, as we assume it was, then the same principle should apply, and the judgment was correct in not holding her accountable for it. We shall not worry about the $30 or $40 in cash.

We discuss the Florida savings and loan accounts (No. 10) separately because they are governed by the law of Florida. The administrator cites Spark v. Canny, Fla., 88 So.2d 307 (1956), and Sullivan v. Chase Federal Savings and Loan Ass'n, Fla., 119 So.2d 78 (1960), as supporting the proposition that the creation of a joint survivorship account does not effect a gift or a contract in favor of the third party. However, the law in Florida is stated in the latter opinion as follows (119 So.2d 80) :

> "The Supreme Court of Florida has determined that where a joint bank account with right of survivorship is established with the funds of one person, a gift of the funds remaining in the account at the death of the creator of the joint account is presumed, but that such presumption may be rebutted."

5. The situation is quite different, of course, from the case in which a person merely writes a note or check and retains it in his possession.

284

The two cited Florida opinions hold merely that in those particular instances the presumption of an intent to create a present interest in the third party was sufficiently rebutted. In this case there is nothing whatever in the evidence to suggest that Smith Ball, in establishing the accounts in question, did not intend the obvious, which was to create a present interest in Charlie. Therefore, the presumption stands and under the law of Florida it was error to adjudge that the surviving co-owner had no right to withdraw the funds after his father's death.

Under our view of the case it becomes unnecessary to consider the competency of various testimony concerning transactions and conversations with a deceased person. Cf. KRS 421.210(2).

The judgment is affirmed on the administrator's appeal and reversed on the other appeals and the cause remanded for further proceedings consistent with this opinion.